DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PHILIP MORRIS USA, INC.,** a foreign corporation,
**R.J. REYNOLDS TOBACCO COMPANY,** individually, and as successor
by merger to **BROWN & WILLIAMSON TOBACCO CORPORATION,**
individually and as successor by merger to
**THE AMERICAN TOBACCO COMPANY,** a foreign corporation,
**LORILLARD TOBACCO COMPANY,** a foreign corporation,
**LIGGETT GROUP LLC** (f/k/a Liggett Group, Inc., f/k/a
Liggett & Myers Tobacco Company), and **VECTOR GROUP LTD., INC.**
(f/k/a Brooke Group, Ltd.), a foreign corporation,
Appellants,

v.

**BRYAN RINTOUL,** as Personal Representative of the
**ESTATE OF EDWARD CAPRIO,**
Appellee.

No. 4D20-1963

[May 11, 2022]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; David A. Haimes, Judge; L.T. Case No. CACE07-036719.

Geoffrey J. Michael of Arnold & Porter Kaye Scholer LLP, Washington, DC and Scott A. Chesin of Shook, Hardy & Bacon LLP, New York, NY, for appellant Philip Morris USA Inc.

Michael A. Carvin of Jones Day, Washington, DC, Eric L. Lundt, and Robert C. Weill of GrayRobinson, Fort Lauderdale, Charles R.A. Morse of Jones Day, New York, NY, and Kenneth M. Grose of Jones Day, Columbus, OH, for appellant R.J. Reynolds Tobacco Company.

Daniel E. Nordby, Steven M. Ebner and Michael A. Muñoz of Shutts & Bowen LLP, Tallahassee, Scott P. Schlesinger, Jonathan R. Gdanski, Steven J. Hammer and Brittany Barron of Schlesinger Law Offices, P.A., Fort Lauderdale, and Bard D. Rockenbach of Burlington & Rockenbach, P.A., West Palm Beach, for appellee.

Mary L. Bonauto and Chris Erchull of GLBTQ Legal Advocates & Defenders, Boston, MA, Freddy Funes of Toth Funes PA, Miami, Andrew

J. Fuller of Gelber Schachter & Greenberg, P.A., Miami, and Daniel B. Tilley, ACLU Foundation of Florida, Miami, for Amicus Curiae-GLBTQ Legal Advocates & Defenders and American Civil Liberties Union of Florida.

PER CURIAM.

In this *Engle*[1] progeny wrongful death case, the defendants, Philip Morris ("PM") and R.J. Reynolds ("RJR"), appeal a final judgment in favor of the plaintiff, Bryan Rintoul, as Personal Representative for the Estate of Edward Caprio, awarding substantial compensatory damages to Rintoul as surviving spouse and punitive damages against both appellants. Of the multiple issues raised, we address three. First, we reverse the punitive damage award based upon *Sheffield v. R.J. Reynolds Tobacco Co.*, 329 So. 3d 114 (Fla. 2021). Second, we conclude that the admission of substantial evidence regarding JUUL Labs, Inc. ("JUUL") and e-cigarettes in support of Rintoul's punitive damage claim was harmful error, requiring a new trial on all issues. Third, we agree with RJR that Rintoul is not entitled to recover non-economic damages based upon *Kelly v. Georgia-Pacific, LLC*, 211 So. 3d 340 (Fla. 4th DCA 2017),[2] which relied on *Tremblay v. Carter*, 390 So. 2d 816 (Fla. 2d DCA 1980), because Rintoul was not married to the decedent when the symptoms of a tobacco-related illness manifested. We reject the trial court's creation of an exception to *Kelly* for a same-sex couple based upon *Obergefell v. Hodges*, 576 U.S. 644 (2015). We conclude that *Obergefell* does not compel us to make an exception to either *Kelly* or *Tremblay*. Therefore, while we reverse all issues for a new trial, Rintoul may not claim compensatory damages as a "surviving spouse" based on those cases.

## Facts

Decedent Edward Caprio, who was born in 1943, began smoking at age 15. In 1996, he was diagnosed with COPD, a disease caused by smoking. Later, he was diagnosed with lung cancer and had surgery to remove portions of his right lung.

Caprio filed suit in 2007, alleging membership in the *Engle* class and asserting claims for strict liability, negligence, fraudulent concealment,

---

[1] *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246 (Fla. 2006).
[2] We note that in *Ripple v. CBS Corp.*, 47 Fla. L. Weekly D750 (Fla. 4th DCA Mar. 30, 2022), this court certified conflict between *Kelly and Domino's Pizza, LLC v. Wiederhold*, 248 So. 3d 212 (Fla. 5th DCA 2018).

and conspiracy. In 2015, while the case was pending, Florida legalized same-sex marriage. Shortly thereafter, Caprio married Bryan Rintoul, with whom he had been in a relationship since 1982. The case mis-tried in 2015. After his COPD worsened, Caprio died in 2018. Following Caprio's death, Rintoul moved to amend the complaint to substitute himself as plaintiff in his capacity as Caprio's personal representative and to assert a wrongful death claim, seeking compensatory damages for himself as a surviving spouse.

RJR objected to the motion for leave to amend in part, opposing Rintoul's amendment to seek surviving spouse loss of consortium non-economic damages as futile. It cited *Kelly* to argue that Rintoul married Caprio after his injuries occurred and therefore could not bring a wrongful death claim for non-economic damages because of Florida's long-standing rule that a spouse cannot marry into a cause of action. In response, Rintoul argued that the application of section 768.20, Florida Statutes (2019)—the Wrongful Death Act—in the manner advocated by RJR would violate his due process and equal protection rights.[3]

The trial court ruled in Rintoul's favor. It distinguished *Kelly*, finding that at the time of the diagnosis of COPD, *i.e.*, the "injury," Rintoul and Caprio could not be lawfully married in Florida because the state did not recognize same-sex marriages until 2015. Under the court's reasoning, applying the "marriage before injury" rule to Rintoul "would operate to discriminate against Rintoul and deprive him of the benefits and protections associated with a legal marriage status solely based on the fact that he was in a same-sex relationship and was unable to legally marry at the time." Thus, the trial court determined that the Wrongful Death Act would be unconstitutional as applied and granted Rintoul leave to amend to add the claim for non-economic damages. The result of this ruling was that at trial, Rintoul would have to prove and the jury would have to find that the couple would have married before 1996 had same-sex marriage been legal at the time.

Before trial, appellants moved to preclude evidence regarding JUUL, e-cigarettes, and other JUUL products. They argued no evidence showed that Caprio used JUUL products nor did JUUL have anything to do with *Engle* progeny cases. Appellants acknowledged that PM was a subsidiary of Altria Group, Inc. ("Altria"), and that Altria had made a $12.8 billion minority investment in JUUL, giving it a thirty-five percent minority

---

[3] RJR asserted in the lower court and here on appeal that Rintoul's arguments should be rejected based on Florida Rule of Civil Procedure 1.071. We reject that argument without discussion.

interest in JUUL in December 2018. Yet PM did not control JUUL. RJR advised the court that it was not involved with JUUL. Both appellants argued that evidence of JUUL was improper and irrelevant to the determination of both compensatory and punitive damages. Additionally, any probative value of the evidence regarding JUUL was outweighed by its prejudicial value. Rintoul countered that the purpose of the JUUL evidence was to show "[p]erpetuation of the adolescent addiction industry and entitlement -- thus reprehensibility and entitlement to punitive damages."

Although PM put JUUL coupons in Marlboro packages, made their customer list available to JUUL for sending coupons, and shared shelf space at stores with JUUL products, PM's counsel argued that the JUUL relationship was not material to the issue of punitive damages because a defendant can only be punished for its own conduct that causes harm to a plaintiff, not a third party's conduct. Rintoul's own expert testified that JUUL products did not harm Caprio. Nevertheless, the trial court ruled the evidence admissible as to punitive damages entitlement.

At trial, a significant amount of testimony and documents involved JUUL, including press releases and documents from Altria. PM again objected to that evidence's introduction because Altria was not a party and was the parent company to PM. The trial court admitted the evidence, stating that the documents could be admitted because JUUL was part of a party opponent. Based upon these rulings, documents discussing concerns over the use of e-cigarettes among children were introduced. The trial court also allowed an expert to testify with respect to e-cigarettes and use by high school students. The expert also pointed out that JUUL was the leader in the e-cigarette market. Other testimony showed that former PM officers were now JUUL officers. Letters from the FDA to JUUL and to Altria were admitted regarding the FDA's concern over children's use of e-cigarettes. Rintoul's attack on JUUL continued during closing argument. In Phase I closing arguments, Rintoul's counsel directly invoked JUUL to argue that the case is "about cigarettes. It's about JUUL and JUUL devices. It's about the perpetuation . . . of the adolescent . . . addiction industry, which is the same as it ever was."

Ultimately, the case was submitted to the jury in Phase I where the jury found that Caprio was addicted to cigarettes which were a legal cause of his COPD. The jury attributed forty-nine percent negligence to both PM and RJR, and two percent negligence to Caprio. The jury's verdict awarded $200,000 in damages to the Estate and $9,000,000 to Rintoul for loss of consortium and pain and suffering. The jury also found by way of special interrogatory that Rintoul and Caprio would have been married before

4

Caprio developed COPD had it been legal for them to do so. Finally, the jury found that punitive damages were warranted against both appellants.

In Phase II of the trial pertaining to the amount of any punitive damages award, Rintoul offered more evidence regarding JUUL over appellants' objection. Appellants also objected to references to JUUL in closing argument. Rintoul's counsel requested $24 million as to each appellant. The jury assessed almost six times the amount which Rintoul requested—$74,122,719.43—in punitive damages against each appellant. Interestingly, that number matched Caprio's age at death, 74, and his date of birth, 12/27/1943.

The trial court entered final judgment on both the compensatory and punitive damages, including remitting the award of economic damages to $155,866.82 to comport with the evidence. Appellants subsequently moved for new trial and a reduction of the punitive damage award on various grounds, all of which were denied. This appeal followed.

**Punitive Damages**

In 1999, the Legislature amended section 768.73 to prohibit punitive damage awards against a defendant in a civil action where punitive damages had previously been awarded against the defendant in another action that alleged "harm from the same act or single course of conduct for which the claimant seeks compensatory damages." § 768.73(2)(a), Fla. Stat. (1999). The single course of conduct included "acts resulting in the same manufacturing defects, acts resulting in the same defects in design, or failure to warn of the same hazards, with respect to similar units of a product." *Id.* The legislation permitted additional punitive damages in certain circumstances:

> (b) In subsequent civil actions involving the same act or single course of conduct for which punitive damages have already been awarded, if the court determines by clear and convincing evidence that the amount of prior punitive damages awarded was insufficient to punish that defendant's behavior, the court may permit a jury to consider an award of subsequent punitive damages. . . . Any subsequent punitive damage awards must be reduced by the amount of any earlier punitive damage awards rendered in state or federal court.

§ 768.73(2)(b), Fla. Stat. (1999). Although the law stated that the amendments "shall be applied to all causes of action arising after the effective date of this act," this court in *R.J. Reynolds Tobacco Co. v.*

5

*Konzelman*, 248 So. 3d 134, 135 (Fla. 4th DCA 2018), agreed with other appellate courts in holding "that the pre-1999 version of section 768.73, Florida Statutes, applies in an *Engle* progeny personal injury suit that is converted into a wrongful death action upon the smoker's death."

Acknowledging that this court had rejected the application of the amended statute in *Engle* cases, PM and RJR nevertheless filed notices in the trial court invoking the amended version of section 768.73(2) and alleging that each had paid millions of dollars in punitive damage awards already. They preserved their claim that the statute applied in their motions for directed verdict and motions for new trial, and they also preserved the issue by raising it in their briefs.

During the pendency of this appeal, the Florida Supreme Court in *Sheffield* reversed *Konzelman*, holding "the relevant 1999 amendments to section 768.73 apply in *Engle* progeny wrongful death actions in which the decedent died after the effective date of the amendments." 329 So. 3d at 125. Because of *Sheffield*, we reverse and remand to the trial court to apply amended section 768.73 in determining any punitive damage award.

## JUUL Evidence and Argument

At trial, the court allowed Rintoul to introduce evidence and argument regarding JUUL on the theory that it was probative on the issue of punitive damages as continued misconduct of appellants. Although PM did not own JUUL, and its parent company Altria owned only a minority interest, Rintoul alleged PM engaged in joint marketing efforts with JUUL by providing JUUL coupons in PM cigarette packages and sharing shelf space at stores. In denying the motion for new trial, which again challenged the admission of the evidence, the trial court explained that evidence of marketing JUUL products and other e-cigarettes as an alternative nicotine delivery device and of targeting minors was the type of conduct which harmed Caprio.

We disagree and hold that admitting the JUUL evidence was error for two reasons. First, admitting JUUL evidence against PM requires disregarding corporate entities, essentially a piercing of the corporate veil without evidence to support it. Second, the sole evidence showing a joint marketing effort between JUUL and PM was, at best, dissimilar to the acts upon which liability for Caprio's death were predicated and thus punished appellants for conduct which did not harm Caprio.

"The standard of review for admissibility of evidence is abuse of discretion." *Nardone v. State*, 798 So. 2d 870, 874 (Fla. 4th DCA 2001)

6

(citing *Melendez v. State*, 700 So. 2d 791 (Fla. 4th DCA 1997)). "However, a trial court's discretion is limited by the rules of evidence." *Nardone*, 798 So. 2d at 874 (citation omitted). The legal question of whether evidence is admissible under an exception to the hearsay rule is reviewed de novo. *Philip Morris USA, Inc. v. Pollari*, 228 So. 3d 115, 120 (Fla. 4th DCA 2017). Because the trial court's decision to pierce the corporate veil involves a pure issue of law, we review it under a de novo standard. *Flooring Depot FTL, Inc. v. Wurtzebach*, 330 So. 3d 47, 49 (Fla. 4th DCA 2021).

To find the evidence regarding Altria's purchase of an interest in JUUL—together with the other evidence about Altria's statements regarding JUUL—was admissible as to PM would require disregarding that PM is a distinct corporate entity:

> [C]ourts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose, *or [] a mere instrumentality or agent of another corporation or individual owning all or most of its stock*, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.

*Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1117 (Fla. 1984) (quoting *Mayer v. Eastwood-Smith & Co.*, 164 So. 684, 687 (Fla. 1936)).

To pierce the corporate veil, litigants must prove the following three factors by a preponderance of the evidence:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
>
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
>
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Flooring Depot FTL*, 330 So. 3d at 49 (citations omitted). Here, Rintoul offered no evidence to pierce the corporate veil to introduce the Altria and JUUL evidence.

We addressed a similar scenario in *Humana Health Insurance Co. of Florida v. Chipps*, 802 So. 2d 492 (Fla. 4th DCA 2001), where the trial court admitted testimony concerning nonparties that imputed culpability to the defendant. In *Chipps*, the plaintiff sued his healthcare insurer for cutting off benefits for specialized care for his child born with cerebral palsy. *Id.* at 494. He sought both compensatory and punitive damages. *Id.* At trial, the court allowed the plaintiff to offer testimony from parents of other critically ill children regarding insurers other than defendant's insurer Humana. *Id.* at 497. This court held:

> To the extent that these insurers were not the same as Humana, we hold the court erred. Although they shared the same parent company (Humana, Inc.) and although the [plaintiff] argued that Humana, Inc. acted as an agent for its subsidiaries in scheming to cut [plaintiff's minor child] and others from the Medical case Management program, Humana, Inc. was not named as a party to this lawsuit. There was no attempt to pierce the parent company's corporate veil or pursue a legal theory that would have allowed the jury to disregard the corporate structure and hold the subsidiaries responsible for each other's conduct. The evidence was irrelevant and unduly prejudicial.

*Id.*

Similarly, in this case, the trial court admitted testimony regarding PM's parent company Altria even though Altria was not a named party. Rintoul made no attempt to pierce the corporate veil and hold Altria responsible for PM. Moreover, PM does not share the same parent company with JUUL, as Altria is only a minority shareholder in JUUL. Even if JUUL were a wholly-owned subsidiary of Altria, Rintoul offered no basis for the jury to disregard its corporate structure and hold PM responsible for JUUL.

We also find the JUUL evidence should not have been admitted, because punitive damages cannot be based on conduct which is dissimilar to that which harmed the plaintiff. "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003). Conduct which is dissimilar from the conduct by which the injured party is harmed cannot be the basis for a punitive damage award to the injured party. *Id.* at 422.

8

In *Campbell*, the insured sued his insurer, State Farm, for failure to pay a claim against him arising out of an automobile accident. *Id.* at 412. The litigation against the insured for the automobile collision resulted in a judgment against the insured far in excess of the policy limits. *Id.* at 413. The insured sued State Farm for bad faith and sought punitive damages. *Id.* at 414. At trial, the insured offered evidence of a nationwide scheme by State Farm to take cases to trial to meet corporate fiscal goals. *Id.* at 415. The trial court allowed the insured to admit substantial expert testimony regarding State Farm's fraudulent practices over twenty years involving cases of all types, many of which did not involve third party automobile insurance claims. *Id.* On appeal from a punitive damage judgment in the amount of $145 million, the Utah Supreme Court upheld the punitive damage award, relying on the evidence of State Farm's national tactics, finding State Farm's conduct was "reprehensible." *Id.* at 415–16.

The Supreme Court held that the award was excessive and noted that State Farm's handling of the insured's claim was sanctionable with punitive damages. *Id.* at 429. Instead of punishing for the handling of the insured's particular case, however, the case "was used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country." *Id.* at 420. The Court provided two reasons for disapproving the reference to State Farm's nationwide practices in the case. *Id.* at 422. First, a state cannot punish a defendant for acts committed in another jurisdiction which were lawful where committed, as the insured admitted many of State Farm's policies were. *Id.* "Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." *Id.* Second, "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *Id.*

The Court also concluded that State Farm could not be punished as a "recidivist." *Id.* at 423. "Although '[o]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance,' in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions." *Id.* (citing *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462 n.28 (1993) (noting that courts should look to "the existence and frequency of similar past conduct")) (internal citation omitted).

9

Applying *Campbell* to this case, we conclude that the JUUL evidence could not be used to support a punitive damage claim for the harm caused to Caprio for at least two reasons. First, the specific conduct which led to Caprio's death was his addiction to tobacco cigarettes and not e-cigarettes. While the nicotine in cigarettes causes an addiction, it is the smoking of the tobacco which results in the terrible diseases its participants can experience. Indeed, the *Engle* findings which form the basis of liability for this case require *smoking* cigarettes:

> 1 (*that smoking cigarettes causes* [*certain named diseases, including lung cancer*]),

945 So. 2d at 1254, 1276–77 (emphasis added); *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 694 (Fla. 2015). E-cigarettes do not involve smoking tobacco, which was the cause of Caprio's disease. Therefore, the harm caused by the tobacco is entirely dissimilar to the JUUL e-cigarettes.

Second, while Rintoul used JUUL to argue that PM continued to market to minors, getting them addicted to nicotine just as it had enticed minors to smoke in the 1950s, the joint marketing introduced at trial consisted of the placement of JUUL coupons in packs of PM cigarettes. However, because minors cannot legally purchase cigarettes, the coupon was lawful conduct directed at adults, not minors. This is not the same conduct which "replicates the prior transgressions." *See Campbell*, 538 U.S. at 423.

Because the court erred in admitting the JUUL evidence and argument, which became a feature of the trial and closing argument, we reverse and remand for a new trial on all issues. We cannot conclude that the error was harmless under *Special v. West Boca Medical Center*, 160 So. 3d 1251 (Fla. 2014).

**Rintoul's Claim as Surviving Spouse**

At the trial court, Rintoul made three related arguments in support of his right to bring a marital consortium claim. Marital consortium is defined under Florida law as a right arising from the marital union to have performance by a spouse of all the duties and obligations assumed by the marriage relationship, including the right to society, companionship, and services. *See Gates v. Foley*, 247 So. 2d 40, 43 (Fla. 1971).

First, Rintoul contended that the Supreme Court's holding in *Obergefell*—that same-sex couples can no longer be denied the right to marry—should be applied retroactively to establish a marriage at a time

before his partner's (later spouse) manifestation of injury. Second, he asserted that this suggested retroactivity of *Obergefell* should be extended to him for the purpose of allowing him to claim consortium damages because he would have been married before his partner's onset of illness but for Florida's prior unconstitutional prohibition of same-sex marriage. Third, Rintoul argues the trial court did not err in submitting this issue to the jury as a finding of fact or in ultimately holding that he was entitled to bring his loss of consortium claim. We disagree as to all three of appellee's arguments.

In August 2014, a federal court ruled Florida's same-sex marriage ban to be unconstitutional. *Brenner v. Scott*, 999 F. Supp. 2d 1278 (N.D. Fla. 2014).[4] Although the court's order in that case had been stayed temporarily, the stay expired in January 2015 when the State of Florida

---

[4] Prior to *Obergefell*, section 741.212, Florida Statutes (2014), governed same-sex marriage in the state of Florida.

**741.212 Marriages between persons of the same sex.—**

(1)  Marriages between persons of the same sex entered into in any jurisdiction, whether within or outside the State of Florida, the United States, or any other jurisdiction, either domestic or foreign, or any other place or location, or relationships between persons of the same sex which are treated as marriages in any jurisdiction, whether within or outside the State of Florida, the United States, or any other jurisdiction, either domestic or foreign, or any other place or location, are not recognized for any purpose in this state.

(2)  The state, its agencies, and its political subdivisions may not give effect to any public act, record, or judicial proceeding of any state, territory, possession, or tribe of the United States or of any other jurisdiction, either domestic or foreign, or any other place or location respecting either a marriage or relationship not recognized under subsection (1) or a claim arising from such a marriage or relationship.

(3)  For purposes of interpreting any state statute or rule, the term "marriage" means only a legal union between one man and one woman as husband and wife, and the term "spouse" applies only to a member of such a union.

§ 741.212, Fla. Stat. (2014).

In 2008, Florida amended its state constitution to define marriage as between a man and a woman. Art. I, § 27, Fla. Const. (2008).

dropped its appeal of the case filed in the Eleventh Circuit Court of Appeals. *See* Order, *Brenner v. Armstrong*, No. 14-14061 (11th Cir. Oct. 19, 2015) (granting voluntary dismissal of state's appeal). Since then, Florida has recognized the legality of same-sex marriages.

However, regardless of Florida's recognition of same-sex marriage in 2015, the state's law on common law marriage remained unaffected. A common law marriage is defined as "[a] marriage that takes legal effect, without license or ceremony, when a couple live together as husband and wife, intend to be married, and hold themselves out to others as a married couple." Black's Law Dictionary (11th ed. 2019). When common law marriages were recognized in Florida, they were given the "same dignity and recognition" as was accorded to ceremonial marriages. *Budd v. J.Y. Gooch Co.*, 27 So. 2d 72, 74 (Fla. 1946). Elements of common law marriage from that time in Florida included cohabitation and the essential requirement of a mutual agreement between the parties "to be husband and wife." *Phillips v. Phillips*, 215 So. 2d 83, 84 (Fla. 3d DCA 1968). Florida ceased to recognize common law marriages in 1968 by enacting section 741.211, Florida Statutes (1968):

> No common-law marriage entered into after January 1, 1968, shall be valid, except that nothing contained in this section shall affect any marriage which, though otherwise defective, was entered into by the party asserting such marriage in good faith and in substantial compliance with this chapter.

In *Obergefell*, the Court did not compel states to convert all same-sex relationships predating that decision into formally recognized marriages. 576 U.S. at 681. *Obergefell's* holding required a state to recognize a same-sex *marriage* that was lawful in another state; it did not directly address the rights of same-sex couples who entered into some other arrangement or agreement, regardless of whether it took the form of an informal understanding or something more formal, such as a civil union or domestic partnership. *Id.* In fact, at no time before the 2015 *Obergefell* ruling, or since, has the Florida Legislature acted to formally recognize such arrangements retroactively.

Rintoul argued in the trial court that he could nonetheless recover loss of consortium damages as a surviving spouse if the jury found that he and Caprio would have been married had it been legal at the time of injury. *Id.* at 675–76. Rintoul claimed, and the jury apparently agreed, that but for Florida's unconstitutional prohibition on same-sex marriage, the couple would have been married years before the accrual of the cause of action. Rintoul emphasized at trial their long-time affection and commitment to

one another.  The parties' commitment to one another is not disputed, yet it is also not relevant to establishing Rintoul's legal right to consortium damages.  The fundamental flaw with his alleged standing to bring such a claim is that Rintoul and Caprio were not married under the laws of Florida, or any jurisdiction for that matter, at the time of the manifestation of Caprio's injury.

Under Florida law, it is axiomatic that marriage is an essential element of a loss of marital consortium claim.  A cause of action for this type of loss of consortium, being incident to the marriage relationship, cannot exist without it.  Absent such a relationship, the right does not exist, and thus no recovery may be had for loss thereof.  Submitting the issue of Rintoul and Caprio's relationship to the jury under the circumstances was an indirect attempt to improperly give retroactive legal recognition to what was, for all intents and purposes, a common law marriage.  Further, giving retroactive legal recognition to a common law relationship based on the jury's interrogatory finding on a verdict form was also error.  Even assuming without deciding that *Obergefell* might have retroactive effect in certain limited circumstances, Florida law does not permit courts to create a "marriage by jury."

Another well-established principle under Florida law is that a spouse assumes the risk of premarital injuries upon marriage.  *See Tremblay*, 390 So. 2d at 818; *Fullerton v. Hosp. Corp. of Am.*, 660 So. 2d 389, 391 (Fla. 5th DCA 1995); *Kelly*, 211 So. 3d at 345.  In *Tremblay*, the Second District considered whether a consortium claim could be brought by the wife of a decedent who succumbed to asbestos-related mesothelioma when their marriage took place after the exposure causing the injury.  390 So. 2d at 816.  The Second District held, "If an accident occurs when the relationship of husband and wife does not exist, a person does not acquire the right to claim a loss of consortium when [t]he [person] subsequently marries the injured party."  *Id.* at 818.  Three reasons exist for the rule: (1) a person should not be permitted to marry a cause of action; (2) one assumes with a spouse the risk of deprivation of consortium arising from any prior injury; and (3) allowing loss of consortium claims arising from premarital injuries would provide for near-unlimited liability for tortfeasors.  *Green v. A.P.C.*, 960 P.2d 912, 918 (Wash. 1998); *Stager v. Schneider*, 494 A.2d 1307, 1315 (D.C. 1985).

The *Tremblay* court explained the rationale for this common law rule:

> Since a cause of action for personal injury and the derivative rights flowing therefrom ordinarily accrue when the tort is committed, the courts concluded that to permit an unmarried

person to claim loss of consortium upon his marriage to an injured spouse would have the effect of allowing him to marry into the cause of action.

390 So. 2d at 817.

In *Kelly*, this court relied on *Tremblay* to hold that a spouse who had married the decedent after the occurrence of the latent injury that caused the decedent's ultimate demise was precluded from recovering loss of consortium or pain and suffering damages under the Wrongful Death Act. 211 So. 3d at 345. This court reiterated that under the common law, a loss of consortium claim required that the spouse be married to the person before the injury. *Id.*

*Kelly* also considered whether the "marriage before injury rule" was limited or whether it also applied in those cases where the injury is a latent injury that did not reveal itself until after the parties marry. *Id.* at 346. There, the plaintiff argued that in the case of latent injuries "there would be no risk, or at least a diminished risk, of a spouse 'marrying into a cause of action.'" *Id.* To resolve that issue, this court relied on the Fifth District's decision in *Fullerton. Id.* In that case, a husband attempted to make a consortium claim stemming from his wife's exposure to radiation when she was a student trainee studying radiation technology at the hospital. *Fullerton,* 660 So. 2d at 390. Although she had been exposed before the marriage, they did not realize that she was injured until three years after they had married when she developed thyroid cancer. *Id.*

The Fifth District in *Fullerton* concluded that the husband could not maintain a consortium claim because his wife's injury occurred prior to marriage, finding that "[i]n the absence of any statutory law on this point, Florida courts are required to follow the common-law rule." *Id.* at 391. The Fifth District also extended the *Tremblay* rule to include a situation where the plaintiffs were aware before the marriage that conduct that ultimately caused the injury—the wife's exposure to radiation—had occurred even though they were not aware that she had been injured from the exposure.[5] *Id.*; *see also Bashaway v. Cheney Bros.*, 987 So. 2d 93, 95–

---

[5] The *Fullerton* court certified the following question to the Florida Supreme Court:

> WHETHER THE COMMON–LAW RULE SET FORTH IN *TREMBLAY V. CARTER*, 390 SO. 2D 816 (FLA. 2D DCA 1980), PRECLUDES A CLAIM FOR LOSS OF CONSORTIUM WHEN THE INJURY WHICH FORMS THE BASIS OF THE CLAIM OCCURS PRIOR TO THE

96 (Fla. 1st DCA 2008) (common law "marriage before injury rule" applied to prohibit loss of consortium claim by unmarried partner in same-sex relationship).

Under Florida law, a personal injury "cause of action accrues . . . when the injury was first inflicted, and not from the time when the full extent of the damages sustained have been ascertained." *Larson & Larson, P.A. v. TSE Indus., Inc.*, 22 So. 3d 36, 42 (Fla. 2009) (quoting *Seaboard Air Line R.R. Co. v. Ford*, 92 So. 2d 160, 164 (Fla. 1956) (on reh'g)). As set forth in *Tremblay* and *Kelly*, these accrual principles also apply to loss of marital consortium claims. Because this cause of action is incident to the marital relationship, our jurisprudence provides that if one spouse was injured before marriage, the other spouse has no right to recover damages for loss of consortium pertaining to that injury.

In *Engle*, the Florida Supreme Court stated that the "cut-off date" for class membership was November 21, 1996—the date the trial court recertified the class—and described the class as those "who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1274 (Fla. 2006) (emphasis omitted) (quoting *R.J. Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39, 40 (Fla. 3d DCA 1996)). The "critical event" in establishing membership in the *Engle* class "is not when an illness was actually *diagnosed* by a physician, but when the disease or condition first *manifested* itself." *Engle*, 945 So. 2d at 1276 (second emphasis added). "The phrase 'who have suffered, presently suffer or have died' supports the view that the class should include only those people who were affected in the past or who were presently suffering at the time the class was recertified by the trial court." *Id.* at 1275.

Applying the *Engle* decision, this court concluded in *R.J. Reynolds Tobacco Co. v. Ciccone*, 123 So. 3d 604 (Fla. 4th DCA 2013), that the "key point in determining *Engle* class membership is pinpointing when the plaintiff began 'suffering' from the smoking-related illness or when the illness 'manifested.'" *Id.* at 615 (quoting *Engle*, 945 So. 2d at 1275). On review of our decision, the Florida Supreme Court in *R.J. Reynolds Tobacco Co. v. Ciccone*, 190 So. 3d 1028, 1030–31 (Fla. 2016), approved this court's definition of "manifestation," stating that "manifestation" for purposes of establishing membership in the *Engle* class means the point at which the

---

MARRIAGE BUT THE CAUSE OF ACTION DOES NOT ACCRUE UNTIL THE INJURY IS DISCOVERED DURING THE MARRIAGE.

Since that case, the Florida Supreme Court has never resolved this question.

plaintiff began suffering from or experiencing symptoms of a tobacco-related disease or medical condition. "Under the definition we adopt, the plaintiff does not need to have been formally diagnosed or know that the symptoms were tobacco-related prior to the 'cut-off date' for class membership." *Id.* However, the court consistently referred to whether the plaintiff was "*suffering* from a tobacco-related disease" as the critical event in establishing whether the disease or condition had manifested itself. *Id.* at 1036.

Unlike in *Kelly*, this case deals with a patent injury and not a latent injury. However, because even a latent injury that precedes marriage would prevent a marital consortium claim, clearly a patent injury, as in this case, would do so as well. Because any deviation from the common law by statute must be unequivocal or so repugnant to the common law that the two cannot co-exist, we held in *Kelly* that the Wrongful Death Act could not be held to have changed the common law. *Kelly*, 211 So. 3d at 342. Thus, while *Kelly* is instructive as a latent injury case, it is not completely dispositive when applied to a case involving a patent injury. Recognizing *Kelly*'s precedential effect, Rintoul argues that we should reconsider that decision. We decline to do so.

The cases which Rintoul cites in support of his argument that *Obergefell* should be applied retroactively to establish a marriage pre-existing 1996, when Caprio's COPD first manifested, are inapplicable here. Those cases, all from other states, deal with the retroactive recognition of common law marriages for same-sex couples in those jurisdictions where such marriages were otherwise recognized for heterosexual partners and where there was factual support for finding the existence of a common law marriage. For instance, in *Ranolls v. Dewling*, 223 F. Supp. 3d 613, 625 (E.D. Tex. 2016), the court applied *Obergefell* retroactively to permit a spouse to assert a claim for damages for the wrongful death of the decedent based upon the long-standing recognition of common law marriages in Texas. Under Texas's informal marriage statute, a common law marriage may be established through the proffer of evidence that the couple "agreed to be married and after the agreement they lived together in this state" and "represented to others that they were married." *Id.* at 618 (quoting Tex. Fam. Code § 2.401); *see also Swicegood v. Thompson*, 865 S.E.2d 775 (S.C. 2021); *LaFleur v. Plyfer*, 479 P.3d 869 (Colo. 2021); *In re J.K.N.A.*, 454 P.3d 642 (Mont. 2019); *In re Estate of Carter*, 159 A.3d 970 (Pa. Super. Ct. 2017). As noted in *Anderson v. South Dakota Ret. Sys.*, 924 N.W.2d 146, 150 (S.D. 2019), courts applying *Obergefell* retroactively did so to recognize a common law marriage which was legal in the state of the parties' residence.

Although Rintoul and Caprio lived together for years and purchased property together, they never attempted to obtain a marriage license. In testimony, Rintoul stated that their commitment to each other was reflected by the couple moving in together. Yet that conduct is common among many couples, both same-sex and heterosexual. Such conduct does not create a marriage. Without obtaining a marriage license, one cannot be married in Florida. Even with retroactive application in certain limited circumstances, *Obergefell* would not support recognizing a marriage between Rintoul and Caprio before 1996.

In sum, the lower court in this case agreed to let a jury reach back in time and establish a same-sex marriage even though Florida did not recognize then, or now, common law marriage. Rintoul asks this court to affirm the establishment of a "common law" marriage. However, juries cannot create marriages in Florida, and courts cannot recognize one where none existed. Though Rintoul attempts to frame the couple's relationship as "just like a marriage," the fact remains undisputed that they were not married under Florida law until 2015. And because Florida has not recognized common law marriages since 1968, the result is clear: Rintoul and Caprio would have had to be legally married at the time of the manifestation of Caprio's injury in 1996 to have a viable marital consortium claim in this case. In accordance with *Tremblay* and *Kelly*, Rintoul cannot claim damages for loss of consortium or pain and suffering as a surviving spouse in either a survival action or under Florida's Wrongful Death Act. Therefore, we reverse Rintoul's final judgment for loss of consortium.

## Closing Argument

PM and RJR also argue that plaintiff's counsel's closing arguments were replete with improper arguments. We need not detail those arguments as many of these same closing argument comments have already been addressed in other cases. *See, e.g.*, *R.J. Reynolds Tobacco Co. v. Gafney*, 188 So. 3d 53, 58 (Fla. 4th DCA 2016); *R.J. Reynolds Tobacco Co. v. Mahfuz*, 324 So. 3d 495, 497 (Fla. 4th DCA 2021); *R.J. Reynolds Tobacco Co. v. Neff*, 325 So. 3d 872, 879 (Fla. 4th DCA 2021). If this case is tried again, counsel has been well warned to steer clear of such arguments.

## Conclusion

For the foregoing reasons, we reverse the final judgment in favor of the Estate and remand for further proceedings, including a new trial on all issues. *Sheffield* requires the reversal of the punitive damage award and remand for further proceedings in accordance with the statute as

17

amended.  329 So. 3d at 125.  A new trial is also required because of the admission of JUUL evidence and argument.  Finally, we reverse the award of damages to Rintoul for loss of consortium and pain and suffering damages based upon *Tremblay*, *Fullerton*, and *Kelly*.  We also certify conflict with *Domino's Pizza, LLC v. Wiederhold*, 248 So. 3d 212 (Fla. 5th DCA 2018).

*Reversed and remanded for further proceedings.*

LEVINE and KLINGENSMITH, JJ., concur.
LEVINE, J., concurs specially with opinion, in which KLINGENSMITH, J., concurs.
WARNER, J., concurs in part and dissents in part with opinion.

LEVINE, J., concurring specially.

I agree with the majority opinion but write to explain in greater detail why we cannot "backdate" appellee's marriage to predate the decedent's injury.  Appellee asks us to make a "very narrow exception" to the common law rule, recognized by this court in *Kelly v. Georgia-Pacific, LLC*, 211 So. 3d 340 (Fla. 4th DCA 2017), that a spouse must be married to the injured spouse before the date of injury or exposure to injury.  We cannot make that "very narrow exception" to the law because the judiciary is without power to do so—only the legislature in our system of separation of powers can enact laws and create any statutory exceptions.  The legislature created the statutory acceptance of the common law in Florida in absence of clear statutory guidance.  *See* § 2.01, Fla. Stat. (2022).  The legislature also created the wrongful death statute which outlined when and who can file claims under the law.  *See* § 768.21, Fla. Stat. (2022).

No matter how sympathetic we are to appellee's argument, we cannot create or effectively "legislate" an exception to well-established law.  We cannot judicially "backdate" a marriage to allow appellee to proceed with his claim.  Neither can we create an effective "common law" marriage, especially since the Florida Legislature has forthrightly and directly abolished common law marriage by statute as of January 1, 1968.  *See* § 741.211, Fla. Stat. (2022).  Only the legislature can change the law.  Thus, based on the present law, we must reverse.

In *Kelly v. Georgia-Pacific, LLC*, this court concluded that "the Wrongful Death Act does not, directly or indirectly, abrogate or supersede the common law requirement that the spouse must be married to the injured party at the time of the injury to recover for loss of consortium."  211 So. 3d at 345.  In *Kelly*, the spouse asked this court also to make an exception,

18

like in the present case, arguing that since the injury in *Kelly* was latent "there would be no risk, or at least a diminished risk, of a spouse 'marrying into a cause of action.'" *Id.* at 346.

We declined to make an exception in *Kelly*, as we do in the present case, because "[i]n the absence of any statutory law on this point, Florida courts are required to follow the common-law rule." *Id.* (quoting *Fullerton v. Hosp. Corp. of Am.*, 660 So. 2d 389, 391 (Fla. 5th DCA 1995)). Once common law is established, the courts "cannot abrogate, modify, repeal, or amend rules long established and recognized as parts of the law of the land." *State v. Egan*, 287 So. 2d 1, 7 (Fla. 1973). Instead, "it is the province of the legislature and not of the court to modify the rules of the common law." *Id.* at 6. Thus, any statute modifying, or as appellee asks us to do, creating an exception, must "explicitly, clearly, and unequivocally" supersede the common law. *Kelly*, 211 So. 3d at 343. We found in *Kelly* that the "legislature did not explicitly and clearly overrule the common law limitation on loss of consortium when enacting the Wrongful Death Act" and that "the common law marriage before injury rule was incorporated into the Act." *Id.* at 345. Thus, it is up to the legislature to create the contours of legislation, and to decide whether to create statutory "exceptions" to the law.

Legislatures in other states, such as Delaware, Illinois, and Washington, have taken initiative to create a statutory process to backdate the date of marriage for pre-existing domestic partnerships and civil unions. Charles W. "Rocky" Rhodes, *Loving Retroactivity*, 45 Fla. St. U.L. Rev. 383, 429 (2018); Del. Code Ann. tit. 13, § 218(e) (2022); 750 Ill. Comp. Stat. 75/65(b) (2021); Wash. Rev. Code § 26.60.100(4) (2022); *see also* Colo. Rev. Stat. § 14-15-118.5 (2022) (calculating the duration of the marriage to include the time in which the parties were in a civil union).

Other states, such as Connecticut, New Hampshire, and Rhode Island, by statute merged civil unions into marriages without backdating the date of marriage to the date of the pre-existing civil union—the effective date of the marriage is the date of recording of the marriage certificate. *See* Conn. Gen. Stat. §§ 46b-38qq(b), 46b-38rr(a) (2022); N.H. Rev. Stat. Ann. § 457:46(II) (2022); R.I. Gen. Laws § 15-3.1-13 (2022).

In any event, it was the legislature in each state that made the decision of what pre-existing domestic partnerships or civil unions would be merged into marriages and whether the marriages would be "backdated" or not. Absent such action from the Florida Legislature to create an exception for same-sex couples prohibited from marrying prior to the decedent's injury, appellee is without redress. "To create such an

exception when one does not clearly exist would constitute impermissible judicial legislation. The wisdom of creating such an exception should be addressed to the legislature." *Martin v. Town of Palm Beach*, 643 So. 2d 112, 115 n.7 (Fla. 4th DCA 1994) (citation omitted). Florida has never passed statewide recognition of civil unions and domestic partnerships, though a few Florida counties have recognized domestic partnerships via ordinances. *See Lowe v. Broward County*, 766 So. 2d 1199 (Fla. 4th DCA 2000) (discussing the constitutionality of the Broward County Domestic Partnership Act).

In the absence of legislative statutory guidance, *Charron v. Amaral*, 889 N.E. 2d 946 (Mass. 2008), is instructive. In *Charron*, appellant and Kalish entered into a relationship starting in 1990. *Id.* at 947. They exchanged rings in a private ceremony in 1994. *Id.* Appellant was diagnosed with breast cancer in 2003. *Id.* at 948. Subsequently both appellant and Kalish applied for a marriage license on the first day Massachusetts permitted same sex marriage, in 2004, as a result of *Goodridge v. Department of Public Health*, 798 N.E. 2d 941 (Mass. 2003). *Charron*, 889 N.E. 2d at 948. The Supreme Judicial Court of Massachusetts rejected Kalish's "argument that we should allow her to recover for the loss of consortium because she meets all other criteria for recovery and would have been married but for the legal prohibition." *Id.* at 950. In *Charron*, the court concluded that the court in *Goodridge* "never stated that people in same-sex, committed relationships (including the *Goodridge* plaintiffs, who had applied for, and were denied, marriage licenses) would be considered married before they obtained a marriage license." *Id.* at 950-51. Further, the court noted it did not "state that it was amending, in any way, the laws concerning the benefits available to couples who marry to make up for past discrimination against same-sex couples." *Id.* at 951.

Similarly, in the present case, we cannot treat a couple married prior to obtaining a marriage license. We cannot backdate, or judicially create, a nonexistent marriage license. Nor, like in *Charron*, can we "amend" the laws concerning "the benefits" available for appellee. This court may not create a license or "engage in forensic retrospective marriage construction." *Hawkins v. Grese*, 809 S.E. 2d 441, 449 (Va. Ct. App. 2018) ("That Hawkins and Grese were legally forbidden to marry in the Commonwealth at the time they began their relationship does not establish that they would have exercised the option if it were available."); *see also Lake v. Putnam*, 894 N.W. 2d 62, 66 (Mich. Ct. App. 2016) ("While we acknowledge that the issue presented in this case is complex, we simply do not believe it is within courts' discretion to, at the request of one party and in light of the United States Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. [644] (2015), retroactively transform an unmarried

couple's past relationship into marriage for the purpose of custody proceedings.").

*Anderson v. South Dakota Retirement System*, 924 N.W. 2d 146 (S.D. 2019), is also persuasive. An individual retired in 2012 and married appellant in 2015 right after *Obergefell* was decided. *Id.* at 147-48. That retired individual died in 2017, and appellant sought survivor's benefits. *Id.* at 148. The South Dakota law defined the surviving spouse eligible for survivor's benefits as a "person who was married to the member at the time of the death of the member and whose marriage was both before the member's retirement and more than twelve months before the death of the member." *Id.* at 149 (citation omitted). The court confronted the issue of whether it may "create a marriage post hoc." *Id.* at 150. The South Dakota court stated that "assuming without deciding that *Obergefell* applies retroactively, there was no marriage, act of solemnization, or common-law marriage to refer back to." *Id.* Further, South Dakota "does not recognize common-law marriage, requiring that a marriage 'be solemnized, authenticated, and recorded.'" *Id.* at 151 (citation omitted). The court concluded that appellant could not meet the statutory definition of a spouse and thus was not entitled to survivor's benefits. *Id.*; *see also In Re Estate of Leyton*, 22 N.Y.S.3d 422, 422 (N.Y. App. Div. 2016) (Under New York law, *Obergefell* "does not compel a retroactive declaration that the 'Commitment Ceremony' entered into by decedent and Hunter in 2002, when same-sex marriage was not recognized under New York law, was a legally valid marriage for purposes of the 'former spouse' provisions . . . .").

In the present case, like South Dakota in *Anderson*, Florida does not recognize common-law marriages. *See* § 741.211, Fla. Stat. (2022) (refusing to recognize any common law marriages entered into after January 1, 1968). States recognizing common law marriage have in certain circumstances allowed same-sex couples to backdate their marriage as these states statutorily do not require a marriage license. *See In re Estate of Carter*, 159 A.3d 970, 977-78 (Pa. Super. Ct. 2017) ("Consequently, because opposite-sex couples in Pennsylvania are permitted to establish, through a declaratory judgment action, the existence of a common law marriage prior to January 1, 2005, same-sex couples must have that same right.") (citation omitted); *LaFleur v. Pyfer*, 479 P. 3d 869, 874 (Colo. 2021).

The dissent says "we should reconsider" *Kelly*, referencing the Florida Supreme Court's decision in *Sheffield*. However, *Sheffield* does not affect *Kelly*. *Sheffield* determined the date of injury for purposes of entitlement to punitive damages under section 768.73. In contrast, *Kelly* involved the issue of the date of marriage for determining standing to proceed on an

action for non-economic damages arising from loss of consortium. The dissent conflates these two disparate issues. The dissent's position, a "marriage after injury" rule, would allow a person to marry into an active lawsuit only one day before death, effectively gutting the common law rule. This is contrary to the dictates of *Kelly* and *Ripple v. CBS Corp.*, 47 Fla. L. Weekly D750 (Fla. 4th DCA Mar. 30, 2022).

In summary, there is no statutory basis in Florida to create or "backdate" a marriage even assuming the parties had solemnized a civil union or domestic partnership at a date prior to the injury. From the time preceding the adoption of the United States Constitution, the founding generation realized that separation of powers was of paramount concern, not just as a structure of government, but also as a guardrail to safeguard the rights of the citizenry.

> A little attention to the subject will convince us, that these three powers ought to be in different hands, and independent of one another, and so ballanced [sic], and each having that check upon the other, that their independence shall be preserved—If the three powers are united, the government will be absolute, *whether these powers are in the hands of one or a large number.* The same party will be the legislator, accuser, judge and executioner; and what probability will an accused person have of an acquittal, however innocent he may be, when his judge will be also a party.
>
> If the legislative and judicial powers are united, the maker of the law will also interpret it; and the law may then speak a language, dictated by the whims, the caprice, or the prejudice of the judge, with impunity to him . . . .

Theophilus Parsons, Essex Result (1778), *reprinted in* Memoir of Theophilus Parsons, Chief Justice of the Supreme Judicial Court of Massachusetts; with Notices of Some of His Contemporaries 373 (Theophilus Parsons ed. 1859).

The judiciary cannot create that missing statutory basis, otherwise "[t]he accumulation of all powers, legislative, executive, and judiciary" would be "in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 2003).

WARNER, J., concurring in part and dissenting in part.

I concur with the majority opinion except the majority's declination to reconsider *Kelly v. Georgia-Pacific, LLC*, 211 So. 3d 340 (Fla. 4th DCA 2017), although I acknowledge that another panel of this court has recently reaffirmed this court's adherence to *Kelly*. *See Ripple v. CBS Corp.*, 47 Fla. L. Weekly D750 (Fla. 4th DCA Mar. 30, 2022). I believe that *Sheffield v. R.J. Reynolds Tobacco Co.*, 329 So. 3d 114 (Fla. 2021), affects the analysis of *Kelly*, and for that reason, I think we should reconsider it.

I would adopt the analysis of Judge Taylor's dissent in *Kelly*. In addition, I would point out that a loss of consortium claim is a derivative claim to the claim of the injured spouse. "[The spouse's] right of action is a derivative right and she may recover only if her husband has a cause of action against the same defendant." *Gates v. Foley*, 247 So. 2d 40, 45 (Fla. 1971). Because the cause of action for loss of consortium is derivative, it must accrue when the injured spouse's claim accrues. *See Tremblay v. Carter*, 390 So. 2d 816, 817 (Fla. 2d DCA 1980). Therefore, the common law rule requiring a spouse to be married at the time of the injury makes sense, because that generally is when the tort cause of action accrues for the injured spouse and thus when any derivative claim would accrue.

The Wrongful Death Act, however, created a new, direct cause of action not recognized at common law. As noted in *Sheffield*, 329 So. 3d at 123, the cause of action for wrongful death, and the damages permitted under the Act, accrue at the date of death, not the date of injury, and the law at the date of death is to be applied. "[A]bsent a death, there can be no 'cause of action' for wrongful death." *Id.* At the date of death, the common law provided no right to recover damages for injuries to a decedent or a spouse. The Wrongful Death Act changed this. The statute authorizes the recovery to the surviving spouse for "loss of the decedent's companionship and protection and for mental pain and suffering from the date of injury." § 768.21(2), Fla. Stat. (2019). This is a direct cause of action, not a derivative cause. And it allows the spouse to recover not only loss of consortium but also for pain and suffering, an element of damage not allowed under common law.

*Kelly* held that the common law "marriage before injury" rule was not abrogated by the statute because "[t]he presumption is that no change in the common law is intended unless the statute is explicit and clear in that regard." 211 So. 3d at 344 (quoting *Thornber v. City of Ft. Walton Beach*, 568 So. 2d 914, 918 (Fla. 1990)). Thus, "[u]nless a statute unequivocally states that it changes the common law, or is so repugnant to the common

23

law that the two cannot coexist, the statute will not be held to have changed the common law." *Id.*

I find *Kelly's* reliance on *Thornber* to be misplaced. In *Thornber*, the issue presented to the court was whether city council members could receive reimbursement for attorney's fees expended successfully enjoining a recall petition. 568 So. 2d at 916. The trial court denied fee entitlement to the council members under section 111.07, Florida Statutes, because the statute allowed for reimbursement of fees for the defense of an action. The council had initiated the action and the trial court found that section 111.07 was the exclusive method to obtain reimbursement. *Id.*

On petition for certiorari, the Florida Supreme Court explained that at common law, Florida officials were entitled to reimbursement for fees expended while defending against litigation arising from the performance of their duties and while serving a public purpose. *Id.* at 916–17. For the purposes of the common law, the court found that the council members were "defending" from an offensive posture of seeking to enjoin the recall petition. Thus, under the common law, the council members were entitled to their fees. *Id.* at 917. The court then turned to the statute and concluded that it did not change the common law "completely" so as to provide the exclusive method of securing reimbursement for fees expended by public officials. *Id.* at 918. "Whether a statutory remedy is exclusive or merely cumulative depends upon the legislative intent as manifested in the language of the statute. The presumption is that no change in the common law is intended unless the statute is explicit and clear in that regard." *Id.* "We agree with the district court that section 111.07 recognizes the common law but disagree that the legislature intended this statute to replace the common law completely." *Id.*

The statute in *Thornber* acted on an existing common law principle, and the supreme court found that both the common law and the statute could co-exist, because the statute did not expressly exclude the common law. Contrast the statute in *Thornber* with the Wrongful Death Act. The Act created a cause of action where no cause of action at common law existed. The Act replaced the common law "completely."

The Legislature provided for an independent action which allowed a surviving spouse to recover for loss of consortium and pain and suffering caused by the death of the other spouse. *See* § 768.21(2), Fla. Stat. (2019). *Kelly* removes that cause of action so that the surviving spouse who is not married at the time of an earlier injury has no cause of action. To limit the spouse's damages because of the date of the marriage adds qualifications to the statutory language not present within its terms.

24

Further, the Act repudiates the common law principle which excludes any post-death action. The Act provides, "[i]t is the public policy of the state to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer. [The Act is] remedial and shall be liberally construed." § 768.17, Fla. Stat. (2019). Hence, the Act is designed "to substitute the financial resources of the wrongdoer for the resources of the decedent" to meet the decedent's financial obligations and "to prevent a tortfeasor from evading liability for his or her misconduct when such misconduct results in death[.]" *Wagner, Vaughan, McLaughlin & Brennan, P.A. v. Kennedy Law Grp.*, 64 So. 3d 1187, 1191 (Fla. 2011). Practically, application of the "marriage before injury" rule when the decedent's only survivor is a surviving spouse, as in this case, subverts this stated purpose by precluding the surviving spouse from bringing a claim. Application of the marriage before injury rule to the Act prevents cost shifting to the wrongdoer as intended by the legislature and allows a wrongdoer to evade liability.[6]

I would hold that the surviving spouse is entitled to recover the damages allowed in the Act. The Legislature created a cause of action not recognized by the common law and thus the Act in its entirety is contrary to the common law. It is within the Legislature's prerogative to set the elements of a cause of action. If the Legislature intended to bar recovery for spouses who did not marry the decedent prior to the injury, even though the spouses were married at the date the cause of action accrued, *i.e.* the death, let the Legislature say so. It is not the place of the judiciary to disregard the plain language of the Act or to add words to alter its express purpose. I would also certify conflict between *Kelly* and *Domino's Pizza, LLC v. Wiederhold*, 248 So. 3d 212 (Fla. 5th DCA 2018).

*        *        *

***Not final until disposition of timely filed motion for rehearing.***

---

[6] In his concurrence, Judge Levine suggests that my analysis is incorrect because it would allow a person to marry into an active lawsuit only one day before the spouse's death and then recover as a surviving spouse. While technically such a result could occur, the concern overlooks the fact that "the jury system continues to be the finest method ever devised for the resolution of disputes." *See Devoney v. State*, 717 So. 2d 501, 505 (Fla. 1998). A jury, in weighing the evidence offered by both sides to determine a surviving spouse's loss of consortium and pain and suffering, would certainly take into consideration the length of the marriage.

25